# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DIEGO A. A., et al.,** | **Civil Action No. 20-4337(MCA)** |
| **Petitioners,** | |
| **v.** | **OPINION** |
| **THOMAS DECKER, et. al,** | |
| **Respondents.** | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

Petitioners Diego A. A., Frederic B., Omatola H., Nasreddine I., and Raul J. are individuals in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") and are detained at facilities in New Jersey. This matter was initially filed in the Southern District of New York, and transferred to this District. *See* ECF Nos. 1 & 10. On April 15, 2020, Petitioners filed an Amended Petition for Writ of Habeas Corpus and Complaint for Injunctive Relief and a Motion for Temporary Restraining Order ("TRO") under Federal Rule of Civil Procedure 65, requesting the Court order their immediate release from detention based on their higher risk of contracting and developing severe complications from the novel coronavirus disease 2019 ("COVID-19"). ECF Nos. 13 ("Amended Petition") & 15 ("TRO Motion"). Respondents oppose the Motion. ECF No. 22. The Court has reviewed the Amended Petition and the parties' submissions and has examined the applicable law. At this time, the Court will dismiss the petition as moot as to Abrego A.A.[1] The Court will reserve judgment as to

---

[1] Petitioners' counsel has advised that Abrego A.A. was released from custody on July 13, 2020. *See* ECF No. 55.

Omatola H., and Raul J. and deny without prejudice as to Frederic B. and Nasreddine I. requests for immediate release for the reasons stated in this Opinion.

## I.   FACTUAL BACKGROUND

### A.   Petitioners' Immigration Proceedings and Relevant Criminal Histories

#### 1.   Frederic B.

Petitioner Frederic B. is a 29-year-old father who entered the United States at or near New York, New York in December 2010 as a nonimmigrant U3.  Am. Petition ¶ 71; Frederic B. Notice to Appear, ECF No. 22.12.  He is a native and citizen of Senegal.  Frederic B. Notice to Appear. After extending his U3 nonimmigrant status, Frederic B. was authorized to remain in the United States through December 9, 2014.  *Id.*  He is currently detained at the Essex County Correctional Facility ("ECCF").  *See* Am. Petition ¶ 10.

On April 1, 2016, Frederic B. was convicted after a jury trial of grand larceny in the fourth degree under N.Y. Penal Law § 155.30(1),(4), attempted grand larceny in the fourth degree under N.Y. Penal Law § 155.30(1), and criminal possession of stolen property in the fourth degree under N.Y. Penal Law § 165.45(2).  Frederic B. Rap Sheet, ECF No. 22.13.  On October 16, 2017, after being released on bond by the immigration judge, he pled guilty to petit larceny under N.Y. Penal Law § 155.25.  *Id.*  On January 28, 2019, he was arrested in New York for identity theft, grand larceny, and petit larceny.  *Id.*  On February 4, 2019, he was arrested in New Jersey on charges related to theft, forgery, and bad checks.  *Id.*  On September 6, 2019, he was arrested in New York for robbery in the third degree.  *Id.*  In November 2019, he was arrested in New Jersey on charges related to robbery, assault, and unlawful possession of a handgun.  *Id.*  The dispositions of the 2019 incidents appear to be pending or unknown.  *See* Resp. Br. at 17.

He was initially detained by ICE on February 23, 2017 and granted bond in 2017. Frederic B. Notice to Appear; Ostolaza Decl. ¶ 8. He was re-detained by ICE in 2019. Ostolaza Decl. ¶ 8. According to Respondents, on February 27, 2020, the immigration judge denied his application for relief from removal and ordered him removed. Resp. Br. at 17. He appealed the decision on March 18, 2020. *Id.* The parties dispute whether Frederic B. is under discretionary detention pursuant to 8 U.S.C. § 1226(a) or mandatory detention pursuant to 8 U.S.C. § 1226(c). *See id.*; Pet. Reply at 10, ECF No. 26.

### 2. Omatola H.

Petitioner Omatola H. is a 28-year-old mother who has lived in the United States since 2003. Am. Petition ¶ 75. She was admitted to the United States as a lawful permanent resident and is a native and citizen of Guyana. Omatola H. Notice to Appear, ECF No. 22.14. She is currently detained at the Bergen Facility. Am. Petition ¶ 75.

On December 15, 2011, she was arrested for sexual abuse in the first degree under N.Y. Penal Law § 130.65 and forcible touching under N.Y. Penal Law § 130.52. Omatola H. Criminal Documents, ECF No. 22.15. She pled guilty to endangering the welfare of a child under N.Y. Penal § 260.10 on October 17, 2012, and was sentenced to probation. *Id.* On July 28, 2019, she was arrested in New York for petit larceny under N.Y. Penal Law § 155.25, *id.*, and pled guilty to disorderly conduct, Omatola H. Mount Vernon City Court Document, ECF No. 26.9.

She was detained by ICE on January 27, 2020, served with a Notice to Appear, and placed in removal proceedings. *See* Omatola H. Notice to Appear. Her removal proceedings are pending, and she has not yet been able to request a bond redetermination hearing. Ostolaza Decl. ¶ 18.

### 3. Nasreddine I.

Petitioner Nasreddine I. is 36 years old and entered the United States in 2010 on a B-2 visa. Am. Petition ¶ 80; Nasreddine I. EARM Summary, ECF No. 22.16. His status was subsequently changed to an F-1 nonimmigrant student and expired on August 19, 2014. Nasreddine I. EARM Summary. He is a native and citizen of Algeria. Nasreddine I. Immigration Judge Bond Decision at 1, ECF No. 22.17. He is currently held at the Hudson County Correction Center ("HCCC"). *See* Am. Petition ¶ 80.

On August 1, 2018, he was arrested in New York for rape in the first degree, criminal obstruction of breathing or blood circulation, and forcible touching. Nasreddine I. Immigration Judge Bond Decision at 2. On October 23, 2018, he was convicted of assault in the third degree, criminal obstruction of breathing, and forcible touching. *Id.* He was sentenced to six months' imprisonment on each count and ordered a five-year order of protection on behalf of the victim, his spouse. *Id.* at 2-3.

He was detained by ICE on September 21, 2019, served with a Notice to Appear, and placed in removal proceedings. *Id.* at 1. After a custody redetermination hearing on November 1, 2019, the immigration judge denied bond. *Id.* According to Respondents, on December 18, 2019, the immigration judge denied his application for relief and ordered him removed to Algeria. Resp. Br. at 19. He appealed both the bond and removal orders, and the appeals remain pending. *Id.*

### 4. Raul J.

Petitioner Raul J. is 28 years old and is a native and citizen of Guatemala. *See* Am. Petition ¶ 84; Raul J. Notice to Appear, ECF No. 22.18. He entered the United States at an unknown place and on an unknown date. Raul J. Notice to Appear. He is currently detained at the Bergen Facility. Am. Petition ¶ 84.

In 2015, he was convicted for driving under the influence. Raul J. Board of Immigration Appeals Decision at 1, ECF No. 22.20. On April 12, 2016, he was arrested for rape in the third degree (victim less than 17 years old) and for endangering the welfare of a child. Raul J. Rap Sheet, ECF No. 22.19. He pled guilty to child endangerment under N.Y. Penal Law § 260.10(1) on August 11, 2017. *Id.* He was sentenced to three years' probation and an order of protection was issued on behalf of the victim. *Id.*

On August 6, 2019, the immigration judge granted Raul J. protection from removal. Raul J. Board of Immigration Appeals Decision at 1, ECF No. 22.20. DHS appealed the decision and the appeal remains pending. *Id.* at 2. On April 1, 2020, his appeal of the immigration judge's decision denying a change in custody status was dismissed. *Id.* at 1.

### B. The COVID-19 Health Crisis

On March 11, 2020, the World Health Organization classified COVID-19 as a global pandemic, anticipating that "the number of cases, the number of deaths, and the number of affected countries" would increase.[2] Around that time, the United States had reported only approximately 1,000 cases of COVID-19.[3] As of June 17, 2020, that number has risen to over 2.1 million and the virus has taken 117,313 lives nationally.[4] New Jersey alone reported a total of 167,703 cases

---

[2] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3] *Coronavirus Case Total Climbs in New York*, THE NEW YORK TIMES (Mar. 11, 2020) https://www.nytimes.com/2020/03/11/nyregion/coronavirus-new-york-update.html.

[4] *Coronavirus in the U.S.: Latest Map and Case Count*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html, (last visited Jun. 17, 2020).

and 12,769 deaths as of June 17, 2020.[5]  Hudson, Bergen, and Essex Counties, where Petitioners are detained, currently have the most COVID-19 cases in the state as of June 17, 2020.[6]

According to the Centers for Disease Control and Prevention (the "CDC"), COVID-19 spreads "mainly from person-to-person" between those "who are in close contact with one another (within about 6 feet)" and possibly when people touch contaminated surfaces and then touch their mouths, noses, or eyes.[7]  Common symptoms of COVID-19 include fever, cough, and shortness of breath.[8]

Experts still have much to learn about how the virus spreads.  In early April, the CDC director, Dr. Robert Redfield, in an interview with National Public Radio affiliate WABE, stated that "a significant number of individuals that are infected actually remain asymptomatic.  That may be as many as 25 percent[,]" and this is important because asymptomatic individuals contribute to the transmission of the virus.[9]  Furthermore, those who become symptomatic can likely transmit the virus up to 48 hours before they show symptoms.[10]  These asymptomatic

---

[5]    *New Jersey Coronavirus Map and Case Count*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html, (last visited Jun. 17, 2020).

[6] *Id.*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html#county (last visited Jun. 17, 2020).

[7] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Jun. 17, 2020).

[8] *Id.*; Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Jun. 17, 2020).

[9] *CDC Director On Models For The Months To Come: 'This Virus Is Going To Be With Us'*, NPR, https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us; *see also* Apoora Mandavilli, Infected but Feeling Fine: The Unwitting Corona-virus Spreaders, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[10] *Id.*

transmitters and individuals who are transmitting the virus before they become symptomatic help explain how rapidly the virus can spread.[11]

Symptoms of COVID-19 can be mild, and "[a]nyone can have mild to severe symptoms."[12] As explained by the CDC, "[s]ome people are more likely than others to become severely ill, which means that they may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die."[13] Among them are persons who are over the age of 65 and people of any age with certain underlying health conditions like moderate to severe asthma, serious heart conditions, diabetes, chronic kidney disease, chronic obstructive pulmonary disease, and obesity ("CDC Risk Factors").[14] The CDC now advises that certain populations are also at higher risk of contracting COVID-19 or developing severe symptoms, including those in long-term care facilities, those with disabilities or behavioral disorders, members of racial or ethnic minority groups, pregnant women, and those who are homeless.[15]

There is presently no vaccine to prevent COVID-19 infections.[16] The CDC and health experts thus emphasize the importance of "social distancing" (i.e. staying at least six feet apart), regularly disinfecting "frequently touched surfaces," and wearing cloth face covering to curtail the

---

[11] *Id.* The CDC also states in its guidance that "COVID-19 may be spread by people who are not showing symptoms." Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Jun. 17, 2020).

[12] Ctrs. For Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Jun. 17, 2020).

[13] Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Jun. 26, 2020) (last visited Jun. 26, 2020).

[14] On June 25, 2020, the CDC updated its guidance to include additional medical risk factors, reflecting available data as of May 29, 2020. Ctrs. For Disease Control and Prevention, *People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jun. 26, 2020).

[15] Ctrs. for Disease Control and Prevention, *People Who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Jun. 26, 2020).

[16] Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Jun. 26, 2020).

spread of the virus.[17]  Ultimately, "[t]he best way to prevent illness is to avoid being exposed to this virus."[18]

But in truth, avoiding exposure to COVID-19 is impossible for most detainees and inmates in correctional facilities, and detainees who meet the CDC's criteria for "higher risk" are the most vulnerable to a detention facility's shortcomings.  In its guidance for correctional facilities, the CDC has explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."  *See* ECF No. 22.1, CDC March 2020 Interim Guidance ("CDC Interim Guidance") at 2.  Consequently, practicing social distancing and ensuring proper hygiene to minimize the risk of infection are exceedingly difficult, and the CDC Interim Guidance recommends extensive testing, cleaning and quarantining procedures to contain the spread of infection.  *Id.*

Against this backdrop, Petitioners assert that they have chronic physical and mental health conditions that increase their risk of serious complications or even death if they were to contract COVID-19 and that the measures taken by HCCC, ECCC, and the Bergen Facility are insufficient to protect them from harm.

### C.    Petitioners' Chronic Physical & Mental Health Conditions[19]

In support of their contention that Petitioners' underlying conditions place them at a higher risk of contracting and developing complications from COVID-19, Petitioners rely on declarations from both medical and non-medical sources.  They cite to the Declaration of Karla Ostolaza, the

---

[17] *Id.*

[18] *Id.*

[19] Respondents assert that Petitioners have not provided medical evidence corroborating their claims.  *See* Resp. Br. at 31-32 n.6.  As discussed in more detail, *infra*, Petitioners are directed to produce evidence corroborating Raul J.'s medical conditions within 10 days of the date of the accompanying Order.

Deputy Director of the Immigration Practice at the Bronx Defenders, who asserts that she is familiar with all of the Petitioners' medical conditions and diagnoses. Decl. of Karla Ostolaza ¶ 2. Additionally, they proffer the Declarations of Robert M. Sapolsky, a neuroendocrinologist and professor at Stanford University, ECF No. 15.3 ¶¶ 1-2, and Allen S. Keller, M.D., a professor at New York University School of Medicine who has over 25 years of experience evaluating prison conditions, ECF No. 15.4 ¶¶ 1-2, among others. Mr. Sapolsky opines "with considerable confidence that stress will significantly increase the risk of [COVID-19] infection and markedly worsen the consequences of this infection." Sapolsky Decl. ¶ 37. He further asserts that based on his review of Petitioners' medical histories and "the highly stressful nature of their current situations," Petitioners have "experienced and will continue to experience exceptionally high levels of stress." *Id.* ¶ 34. Therefore, Sapolsky concludes, Petitioners are "likely at considerably heightened risk of contracting COVID-19 and becoming severely ill and even dying if they do." *Id.* ¶ 35.

Dr. Keller reaches similar conclusions. *See* Keller Decl. ¶¶ 63-71. He opines that "people with severe mental illness are 'immunosuppressed' and belong in the same high risk category when it comes to COVID-19 as preexisting physical conditions that put people at heightened risk," *id.* ¶ 24. He further notes that "[s]olitary confinement is especially harmful to people with serious mental illness because it can severely exacerbate an existing condition or cause a recurrence of a prior condition," and the harms of such confinement "will likely be worse" during a COVID-19 outbreak in a jail. *Id.* ¶¶ 34-35.

### 1. Frederic B.

Frederic B. suffers from asthma, PTSD, anxiety, and depressed mood, was a regular smoker before his detention, and has had suicidal ideations in the past. Am. Petition ¶¶ 10, 73.

Since March 24, 2020, he has exhibited flu-like symptoms, including coughing, vomiting, acute shortness of breath, and weakness. *Id.* ¶ 72. He was placed in isolation on March 27, 2020, purportedly in a cell next to an individual who is positive for COVID-19. *Id.* The only treatment he has received for recent physical symptoms is an asthma inhaler and ibuprofen. *Id.* Petitioners claim that his conditions have "worsened considerably" since being placed in isolation. *Id.* ¶ 10.

### 2. Omatola H.

Omatola H. has been diagnosed with bipolar disorder, anxiety, depression with suicidal ideations, schizoaffective disorder, PTSD, and bilateral keratoconus, a deteriorating eye condition. *Id.* ¶ 11; *see also* Omatola H. Medical Records, ECF No. 33.1. She has been prescribed additional medication for sleep interruptions caused by her anxiety. Am. Petition ¶ 76. Prior to her detention, she was an occasional smoker. *Id.* ¶ 11. Petitioners assert that despite medication, her suicidal ideations have worsened "due to her ongoing detention, the pandemic, and a jail lockdown that forces her to spend 23.5 hours each day alone in her cell." *Id.* The record discloses that between April 1, 2020, and April 29, 2020, she was treated multiple times for physical and mental health conditions. *See* Omatola H. Medical Records.

### 3. Nasreddine I.

Nasreddine I. suffers from anxiety, depression, sleep disturbance, and headaches. Am. Petition ¶ 12. He has also experienced trauma symptoms throughout his life, including hypervigilance, paranoia, depression, mania, constant nervousness, and difficulty eating and sleeping. *Id.* Recently, he experienced a day-long fever and diarrhea. *Id.* While he takes medication for his mental health conditions, Petitioners claim that his conditions have worsened in lockdown, where he is confined to a shared cell for 23.5 hours per day. *Id.*

### 4. Raul J.

Raul J. has been diagnosed with PTSD, anxiety, and depression and has had suicidal ideations in the past. *Id.* ¶ 13. He recently suffered from a fever and dry cough. *Id.* His most recent cellmate was sick with flu-like symptoms, but the cellmate was not treated, the cell was not disinfected, and Raul J. was not given any personal protective equipment ("PPE"). *Id.* ¶¶ 13, 88. In addition, Petitioners assert that, despite medication, Raul J.'s mental conditions have deteriorated during his detention, which he spends alone in a cell for 23.5 hours per day. *Id.* ¶ 13. As of April 15, 2020, he had not been able to access any mental health services for two months. *Id.* ¶ 86.

### D. The Facilities' COVID-19 Management & Prevention Protocols

Respondents maintain that the Bergen Facility, HCCC, and ECCF (collectively, the "Facilities") have implemented "preventative measures against the spread of COVID-19" and "procedures and protocol to protect the detainees and staff in [their] care." Resp. Br. at 2, 28. Based on a review of the certifications submitted by the Bergen Facility Warden Steven Ahrendt, ECF No. 22.5, HCCC Director Ron Edwards, ECF No. 22.6, and ECCF Director Alfaro Ortiz, ECF No. 22.7, it appears that, for purposes of this Opinion, those measures are best explained in two categories: external prevention and internal prevention and management.

### 1. External Prevention

The Facilities have taken precautions to mitigate the risk of COVID-19 exposure arising from external influences. The Bergen Facility has indefinitely suspended all ICE detainee intakes and screens new county inmates, staff members, and vendors for the virus. Ahrendt Decl. ¶¶ 9.a., 9.b., 9.d. HCCC and ECCF are still accepting ICE detainees, with exceptions at HCCC, and detainees and inmates are subject to medical evaluations before entering. Edwards Decl.

¶¶ 12.b.i., 12.b.ii., 12.b.vii; Ortiz Decl. ¶ 8; 15.r.  Both the Bergen Facility and HCCC have suspended all social visitations and tours, and only "no-contact" visits and telephone conferences are permitted with attorneys.  Ahrendt Decl. ¶ 9.c; Edwards Decl. ¶¶ 12.d.i, 12.h.-j.  ECCF has disallowed visitation from family and friends of inmates and detainees, and only "window" visits, telephone calls, and video conferencing with attorneys are permitted.  Id. ¶¶ 15.n, 16.d, 16.g, 16.j.

### 2. Internal Prevention and Management

In addition to their efforts at preventing exposure from external factors, the Facilities have taken affirmative steps to lessen the risk of COVID-19 exposure and transmission within the jails.

#### i. Social Distancing and Cleaning

At the Bergen Facility, all detainees must remain in their cells at all times, "except for a thirty-minute period each day when they are permitted to exit the cell area."  Ahrendt Decl. ¶ 9.f.  To promote social distancing, during that thirty-minute period, "only four inmates/detainees are permitted to leave the cell area" where they have "2643 square feet of space" for recreational use and showering.  *Id.*  Detainees and inmates have meals inside their cells to avoid congregating.  *Id.* ¶ 9.l.  With respect to cleaning and hygiene, "[a]ll housing units are sanitized no less than four times per day."  *Id.*  Respondents also indicate that "[t]he Facility provides disinfectant spray, hand sanitizer, and soap in every housing unit."  *Id.*

HCCC has implemented a "[r]estrictive schedule."  Edwards Decl. ¶ 11.  As a social distancing measure, beginning on March 21, 2020, the "recreation period" is now staggered to permit only two "inmates/detainees" to leave their cells for a thirty-minute recreational-use period.  *Id.* ¶ 12.k.  Detainees have meals inside their cells to prevent congregation.  *See id.* ¶¶ 12.e, 13.e.  With respect to cleaning and hygiene, HCCC "lock[s] down" each housing unit in between shifts for cleaning and sanitization, which occurs, at a minimum, three times per day.  *See id.*  ¶¶ 11,

12.e.  HCCC also reports that it cleans the recreation areas "constantly" each day, *id.* ¶ 12.k, but does not state when, how often, and what that cleaning entails.  It has provided its staff with PPE. *Id.* ¶ 13.c.

ECCF has "modified inmate and detainee recreation groups to limit close interaction with other inmates and detainees [and] [r]educed the number of inmates having recreation at the same time by one half to foster social distancing."  Ortiz Decl. ¶ 16.e.iii.  Staff sanitizes the housing units at least three times per day and the kitchen every hour.  *Id*. ¶¶ 15.m., 15.i.iv.  Inmates and detainees eat their meals in their pods, where they are provided, or in passive recreation areas.  *Id.* ¶ 15.j.  As for PPE and other supplies, ECCF has received 1,008 Tyvek suits, 1,200 N95 masks, and 29,900 blue surgical masks.  *Id.* ¶ 16.i.  ECFF has "a six-month inventory of supplies" for "all needed items," *id.* ¶ 15.b., but does not identify what those "needed" items are.  It has also acquired fifty COVID-19 testing kits.  *Id*. ¶ 16.a

### ii.    Medical Response, Quarantine, and Isolation

The Facilities follow similar isolation and quarantine protocols for confirmed and suspected cases of COVID-19.  Confirmed cases that do not require hospitalization are isolated in a designated area.  Ahrendt Decl. ¶ 9.i.; Edwards Decl. ¶ 15; Ortiz Decl. ¶ 18.  At the Bergen Facility and HCCC, symptomatic inmates or detainees who are awaiting test results are isolated or quarantined, Ahrendt Decl. ¶ 9.i.; Edwards Decl. ¶ 16; at ECCF, they are "evaluated by the medical severity," are started on antiviral medications, and have their vitals monitored on a daily basis, Ortiz Decl. ¶ 19.[20]  Finally, those who are asymptomatic but "have had a known exposure" to a confirmed COVID-19 case are "cohorted" together with restrictive movement for a fourteen-day

---

[20] Ortiz also indicates that "[i]nmates or detainees [at ECCF] who are placed in quarantine stay there for 14 days," Ortiz Decl. ¶ 19, but it is unclear whether symptomatic inmates or detainees awaiting test results are automatically quarantined.

period.  Ahrendt Decl. ¶ 9.j.; Edwards Decl. ¶ 17; Ortiz Decl. ¶ 21.  Cohorting ends if no new COVID-19 case develops within that period.  *Id.*

Each Facility also has on-site medical personnel who are available 24/7.  Ahrendt Decl. ¶ 7; Edwards Decl. ¶ 7; Ortiz Decl. ¶ 9.  Detainees and inmates at the Facilities are able to make daily sick calls to on-site medical staff.  Ahrendt Decl. ¶ 9.h.; Edwards ¶ 14; Ortiz Decl. ¶ 17.  If detainees or inmates complain of illness, medical staff evaluates them.  Ahrendt Decl. ¶ 9.h.; Edwards ¶ 14; Ortiz Decl. ¶ 17.  Those who present with COVID-19 symptoms are provided a "surgical mask."  *Id.*  The Bergen Facility and ECCF both indicate that detainees and inmates may be transported to a hospital for evaluation.  *See* Ahrendt Decl. ¶ 9.h.; Ortiz Decl. ¶ 18.  ECCF also houses inmates and detainees with high-risk health conditions, as identified by the CDC, separately, and the correctional officers who work with those individuals use full PPE.  Ortiz Decl. ¶ 33.  HCCC uses some form of COVID-19 testing on inmates. *Id.* ¶ 15.  As for detainees and inmates with high-risk health conditions, as identified by the CDC, HCCC "[e]stablished a new protocol" that includes "daily monitoring" and establishing "a plan to remove [them] from the rest of the population if determined to be necessary" from the Facility's "Medical Department."  *Id.* ¶ 12.g.iv.

### E.  Petitioners' Evidence Regarding the Conditions at the Facilities

Petitioners argue that the Facilities' management and prevention practices are insufficient to protect them against COVID-19.  *See* Pet. Reply at 4-6, ECF No. 26.  Briefly, they assert that "the conditions on the ground" show, among other things, shortages in basic hygiene supplies, including antibacterial soap, paper towels, and gloves, *see, e.g.*, Pet. Reply at 5; Supp. Keller Decl. ¶ 27, ECF No. 26.1; Arcia-Quijano Decl. ¶¶ 9, 11, ECF No. 26.8, cursorily and infrequently cleaned common areas and cells, *see, e.g.*, Vergara Pérez Decl. ¶ 10, ECF No. 26.7, Lieberman

Decl. ¶¶ 11, 13, ECF No. 26.6, and inadequate medical care, including significant delays in receiving care, and, at HCCC and ECCF, prescribing anti-viral medications that have not been approved to treat COVID-19, *see, e.g.*, Supp. Keller Decl. ¶¶ 16-18. Some detainees have not been given masks or gloves or have been given a limited number of masks, *see, e.g.*, Lieberman Decl. ¶ 12; Arcia-Quijano Decl. ¶ 11, and there are reports of correctional officers not wearing gloves or masks at all, *see* Arcia-Quijano Decl. ¶ 11. In some cases, the detainees themselves are the only people cleaning their cells, and they have limited access to cleaning supplies, *see, e.g.*, Lieberman Decl. ¶ 10; Vergara Pérez Decl. ¶ 10; Arcia-Quijano Decl. ¶ 6.

With respect to ECCF's testing efforts, Petitioners emphasize that the Facility is administering "unreliable" antibody tests, which carry the risk of false negatives and positives and lack "predictive power" as to an individual's immunity and contagiousness. Pet. Reply at 4; Supp. Meyer Decl. ¶ 17, ECF No. 26.2. Moreover, they note there is also an "overreliance on outside medical services" at the Facilities, which, in one instance, led to a delay in urgent care for an individual held at ECCF and who died by the time an ambulance arrived. Supp. Keller Decl. ¶ 13.

With respect to the Facilities' mental health efforts, Dr. Keller noted that "[w]hile ECCF and HCCC stated that individuals at high risk from COVID-19 are being housed separately, there is no indication that they consider individuals with [severe and persistent mental illnesses] to be high risk." *Id.* ¶ 12. Furthermore, Dr. Keller observed that the Bergen Facility "does not describe any measures being taken to protect those at high risk," and neither the Bergen Facility nor ECCF "describe any steps at all being taken to protect individuals with [severe and persistent mental illness] from their heighten risk due to isolation." *Id.*

In addition, Petitioners claim that ICE's guidance on detention standards are inadequate because the guidance fails to: (1) satisfy certain CDC standards governing PPE use, cleaning,

screening for and tracking of COVID-19, communication, training, and food safety, *see* Venters Decl. ¶¶ 1, 3-4, 6, 8, ECF No. 26.4; or (2) address mental health risks associated with COVID-19, *see* COVID-19 Pandemic Response Requirements, ECF No. 22.4.

### F. Testing Results

On May 12, 2020, the Court ordered Respondents to produce information regarding the Facilities' detention populations and COVID-19 testing practices. ECF No. 39. By letter dated May 16, 2020, Respondents indicated that: (1) at ECCF, 1,333 inmates and detainees have received an antibody test at the Facility, 928 of which were negative, and 12 have received a diagnostic test at a hospital, 6 of which were positive; (2) at the Bergen Facility, 5 inmates and detainees have received a diagnostic test at a hospital, 3 of which were positive; and (3) at HCCC, 110 inmates and detainees have received a diagnostic test at the Facility, 44 of which were positive. Resp. May 16, 2020 Letter at 3-5, ECF No. 43.[21] The Facilities have released some, but not all, individuals who have been tested for COVID-19. *See id.* at 4-5, 10.

In response to the Court's inquiry regarding the number of inmates and detainees who have presented symptoms of COVID-19 but have not been tested, Respondents noted that: (1) ECCF has administered an antibody test to every inmate and detainee with symptoms; (2) the Bergen Facility has isolated and monitored 22 symptomatic inmates and detainees without testing; and (3) HCCC is unaware of any symptomatic inmate or detainee who has not been tested at the Facility. *See id.* at 14-15.

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that his custody violates the Constitution, laws, or

---

[21] Respondents also note that ECCF administers antibody tests to its staff and HCCC administers diagnostic tests to its staff. *See* Resp. May 16, 2020 Letter at 11-12. The Bergen Facility, however, does not test its staff. *See id.* at 11.

treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek Section 2241 relief only in the district in which he is in custody. *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009). This Court has jurisdiction over Petitioners' claims as they are detained within this district and allege that their continued detention violates the Due Process Clause of the Fifth and Fourteenth Amendments.

Petitioners have filed a TRO seeking their immediate release from detention, which the Court construes as a request for a preliminary injunction. *See Hope v. Warden York Cty. Prison*, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020). Motions for temporary and preliminary injunctive relief are governed by a four-factor test. The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief. *Id.* at 176, 179. "If a plaintiff meets the first two requirements, the District Court determines in its sound discretion whether all four factors, taken together, balance in favor of granting the relief sought." *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019).

The Court also considers whether Petitioners have established extraordinary circumstances justifying their release. *See Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986); *Landin v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Soule's*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

17

## III.   DISCUSSION

Courts in this District and in neighboring districts have, in the last few months, released medically vulnerable ICE detainees; those decisions include two from this Court releasing medically vulnerable petitioners at the Facilities. *See, e.g., Cristian A.R. v. Decker*, No. 20-3600, ECF No. 26 (D.N.J. April 12, 2020) (finding that the protocols in place at HCCC and the Bergen Facility did not adequately protect medically vulnerable detainees and holding that continued detention of such detainees during COVID-19 pandemic amounted to punishment under the Fifth Amendment); *Jose B.R. v. Tsoukaris*, No. 20-3347, 2020 WL 2744586 (D.N.J. May 27, 2020) (granting release of detainee suffering from mental illness from ECCF on conditions of confinement and extraordinary circumstances grounds); *see also Rafael L.O.  v. Tsoukaris*, No. 20-3481, ECF No. 25 (D.N.J. April 9, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Jeferson V. G. v. Decker*, No. 20-3644, 2020 WL 1873018 (D.N.J. Apr. 15, 2020); *Kevin M.A. v. Decker*, No. 20-4593, 2020 WL 2092791, at *10 (D.N.J. May 1, 2020). The Court now analyzes whether Petitioners in this action can satisfy the standards for a preliminary injunction and have asserted extraordinary circumstances needed to warrant release from habeas detention.

### A.   The Gateway Factors

Petitioners assert that their conditions of confinement amount to punishment under the Due Process Clause and that Respondents' failures to address their medical needs during the COVID-19

outbreak amount to deliberate indifference to their serious medical needs.[22]  *See* Pet. Br. at 20-27.  Recent decisions in this District have established the legal backdrop governing conditions of confinement claims brought by civil detainees. *See, e.g., Cristian A.R.*, No. 20-3600; *Rafael L.O.*, 2020 WL 1808843.  Civil detainees are entitled to due process and may bring conditions of confinement claims under the Due Process Clause of the Fifth (or Fourteenth) Amendment as opposed to the Eighth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979); *E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019).  The Fifth and Fourteenth Amendments protect civil detainees like Petitioners from any—*not just "cruel and unusual"*—punishment.  *See Hubbard v. Taylor*, 399 F.3d 150, 166-67 (3d Cir. 2005).

To determine whether Petitioners' conditions of confinement constitute punishment, the Court asks whether the challenged conditions are reasonably related to a legitimate governmental objective, and if they are not, it may infer "'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'" *E.D.*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).  A condition or deprivation amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials"; no "alternative purpose to which [the condition or deprivation] may rationally be connected is assignable for it"; or the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v.*

---

[22] Although Respondents argue, *inter alia*, that Petitioners' detentions are lawful under § 1226(a) and (c) and that they do not have a due process right to a discretionary grant of parole, Petitioners emphasize that their claims are based on substantive due process concerns, not statutory or procedural due process concerns.  *See* Pet. Reply at 10-11 n.4, ECF No. 26.  Therefore, the Court will only address the parties' substantive due process arguments.  *See Durel B. v. Decker*, No. CV 20-3430, 2020 WL 1922140, at *5 (D.N.J. Apr. 21, 2020) ("Respondents contend that Petitioner is lawfully detained, that he has not exhausted his administrative appeal by requesting a bond hearing, and that he does not have a due process right to the discretionary grant of parole. . . . However, Petitioner here is raising a due process challenge to the conditions of his confinement and not a challenge to the government's authority to detain him. The fact that Petitioner is subject to detention under § 1231(a) does not negate his argument that the conditions of his confinement may be unconstitutional.").

*Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).  The Court considers "the totality of the circumstances within an institution" to determine whether given conditions constitute punishment. *Hubbard*, 399 F.3d at 160 (internal quotation marks and citation omitted). Civil detainees, like inmates, may be entitled to relief if they prove threats to personal safety from exposure to serious contagious diseases.  *See Cristian A.R.*, No. 20-3600, slip. op. at 19 (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

Respondents assert that the Facilities have sufficiently implemented recommendations from the CDC to combat the spread of COVID-19.  *See* Resp. Br. at 27-28.  In *Cristian A.R.*, the Court analyzed the conditions of confinement at HCCC and the Bergen Facility during the COVID-19 pandemic and concluded that both Facilities failed to protect the most vulnerable detainees in their care.  *See* 2020 WL 2092616, at *10-12.  Similarly, in *Jose B.R.*, the Court found that the conditions of confinement at ECCF were insufficient "to curtail the spread of COVID-19 to vulnerable detainees."  2020 WL 2744586, at *10.  Here, after considering the totality of the circumstances, including any improvements made since those prior decisions, the Court finds that the hygiene and sanitation concerns highlighted by Petitioners and outlined above demonstrate that Respondents' efforts to combat the spread of COVID-19, while laudable, fall short of protecting vulnerable detainees at the Facilities.  Simply put, the declarations submitted by both the Facilities and the Petitioners illustrate a disconnect between the Facilities' stated protocols and detainees' lived experiences.

Respondents next argue that Petitioners are unable to establish irreparable harm because their medical conditions do not put them sufficiently at risk of complications from COVID-19. *See* Resp. Br. at 31-34.  Respondents appear to limit this argument to Petitioners Omatola H., Nasreddine I., and Raul J., because those Petitioners suffer from mental impairments that are not

recognized as high-risk factors by the CDC. *See id.* at 31-32. In their brief, Respondents cite to *Francisco M. v. Decker*, 20-2176 (D.N.J. Mar. 25, 2020) and *Ousman D. v. Decker*, No. 20-2292, 2020 U.S. Dist. LEXIS 63976, at *27 (D.N.J. Apr. 13, 2020), the latter of which held that injunctive relief in the form of immediate release is not mandated where an immigration detainee is not "part of the vulnerable population that is predisposed to suffering the most severe effects of COVID-19." They invite this Court to follow *Graham v. Decker*, No. 20-2423, 2020 WL 1847568, at *4 (S.D.N.Y. Apr. 13, 2020) (denying release to petitioner with underlying physical and mental health conditions, including PTSD and persistent depressive disorder, where petitioner cited "articles that describe a potential for weakened immunity as a result of these conditions, but he does not describe a personal history of immunodeficiency"). The Court declines Respondents' invitation. Unlike *Graham*, which is a non-binding, out-of-circuit case, Petitioners here rely on more than mere "articles" to support their claim that they are immune-compromised. They proffer, *inter alia*, the declaration of Mr. Sapolsky, who has decades of experience in the area of stress and who reviewed a summary of Petitioners' personal medical histories, to show that Petitioners' mental health conditions contribute to high levels of stress, which in turn negatively impacts the immune system. *See* Sapolsky Decl. ¶¶ 2, 33-35.[23]

---

[23] The Court also rejects Respondents' contention that "Petitioners' theory that the 'links between stress and impaired viral defenses' warrants release from detention . . . sets a troubling precedent" because it does not contain a "limiting princip[le]." Resp. Br. at 33. Petitioners' theory is based on the fact that Petitioners suffer from underlying conditions that are exacerbated by stress. Contrary to Respondents' assertions, this theory would not require the release of every detainee who experiences stress due to the COVID-19 pandemic. Rather, it would only apply in circumstances where, like here, a detainee has sufficiently demonstrated an underlying condition that renders him or her more susceptible to "high levels" of stress. *See, e.g.,* Sapolsky Decl. ¶¶ 34-35.

Furthermore, the Court declines any invitation by Respondents to find that an individual detainee must have a CDC Risk Factor for COVID-19 to warrant release from confinement.[24] In *Reyes P. v. Edwards*, No. 20-3686, 2020 WL 2474423, at *7 (D.N.J. May 13, 2020), this Court denied immediate release to a Petitioner who appeared to have no chronic underlying health conditions, and cited to the CDC Risk Factors as examples. *Id.* at n.7. The Court noted, however, that it made "no determination about the types of conditions that could support a claim for relief."[25] *Id.* In this regard, the CDC recently expanded the list of potential medical risk factors for severe illness in light of updated data and also recognizes that certain populations, including those with developmental and behavioral disorders, may be at higher risk of contracting COVID-19 or developing severe symptoms if they contract the virus.[26]

Respondents also raise an evidentiary issue regarding Petitioners' medical and mental health conditions. They note that while Petitioners claim to suffer from various impairments, they have not proffered sufficient medical evidence to support their claims. *See* Resp. Br. at 31-32 n.6. Petitioners have provided expert opinions stating that their underlying conditions render them more susceptible to contracting and developing severe complications from COVID-19, *see, e.g.*, Sapolsky Decl. ¶¶ 33-35; Keller Decl. ¶¶ 63-67, but, with the exception of Omatola H., have not provided the Court with any medical records or other medical evidence to substantiate their

---

[24] Respondents cite to *Anthony W. v. Anderson*, No. 2:20-CV-3704, 2020 WL 2121118 (D.N.J. Apr. 17, 2020) and note that the *Anthony W.* court reserved decision on a petitioner with underlying conditions not recognized by the CDC. *See* Resp. Br. at 33. While Respondents correctly note that one of the *Anthony W.* petitioners did not suffer from a CDC Risk Factor, a review of the decision reveals that the court had reserved ruling on the petitioner's claim pending further briefing because the petitioner's claim had changed. *See Anthony W.*, 2020 WL 2121118, at *1 n.2.

[25] Indeed, this Court recently held that a petitioner with schizophrenia-spectrum disorder established a likelihood of success on his claim that his detention amounted to punishment under the Due Process Clause claim in light of his conditions of confinement and his particular mental health vulnerabilities. *See Jose B.R.*, No. 20-3347, 2020 WL 2744586, at *12; *see also Durel B. v. Decker*, No. 20-3430, 2020 WL 1922140 (D.N.J. Apr. 21, 2020) (releasing petitioner with schizoaffective disorder and posttraumatic stress disorder).

[26] *See supra* notes 13-14.

underlying medical conditions. First, based on the current record, the Court finds that Petitioner Raul J. has sufficiently demonstrated his particular vulnerabilities, provided that the parties produce the medical evidence within 10 days of the date of the accompanying Order that corroborates Petitioner's claimed conditions. Second, as to Petitioner Omatola H., the Court is satisfied that the medical records annexed to Respondents' April 30, 2020 letter provide sufficient evidence of her underlying ailments. *See* ECF No. 33. Finally, the Court need not address this evidentiary issue with respect to Petitioners Frederic B. and Nasreddine I. because, and as discussed in greater detail *infra*, the balance of equities does not warrant their release, even if the Court were to fully credit their asserted medical conditions.

Due to their conditions of confinement at the Facilities, where sanitation and other concerns persist, as well as their particular medical vulnerabilities, the Court finds that Petitioners have shown a likelihood of success on the merits of their constitutional claim that their detentions during the COVID-19 pandemic amount to punishment.[27] To the extent a particular Petitioner has a medical or mental health condition that is a less established comorbidity for COVID-19, the Court has taken that into account in its balancing analysis below.

To be entitled to a preliminary injunction, a movant must also establish that he or she is "more likely than not" to suffer irreparable harm absent the requested relief. *See Reilly*, 858 F.3d at 179. As the Court found with respect to the petitioners in *Cristian A.R.* and *Jose B.R.*, the Court

---

[27] Civil detainees also have a constitutional right to adequate medical care, including the creation of policies ensuring adequate health care, and such claims are governed by the deliberate indifference standard. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003) (holding that a reasonable jury could conclude that a governmental entity's failure to establish a policy to address inmates' immediate medication needs constituted deliberate indifference); *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 585 (3d Cir. 2004) (detention center's lack of policies to address the physical and mental health needs of residents caused the plaintiff harm). Because the Court finds that Petitioners are likely to succeed on their claim that their conditions amount to punishment and because deliberate indifference has a more stringent *mens rea* requirement, it need not reach the deliberate indifference claim. In this regard, the Court notes that it would balance the equities and the public interest in the same manner for both types of claims.

is also inclined to find that Petitioners in this action—to the extent they can substantiate their medical conditions—have shown a likelihood of irreparable harm due to their medical vulnerabilities and the conditions of confinement at the Facilities.

### B.     Balancing of the Equities and the Public Interest

That brings the Court to the balancing of the equities and the public interest, which is the nub of the decision in this case.  "Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis*, 290 F.3d at 596 (internal citation omitted).  Respondents argue that "ICE has good reason to believe Petitioners will be a danger to the community" in light of their criminal histories.  Resp. Br. at 29.  Petitioners contend that the balance of equities and public interest weigh heavily in their favor and argue that their criminal histories do not justify their continued civil detention in unsafe conditions.  Pet. Reply at 9.  They further assert that "any countervailing risk of flight or to public safety can be mitigated by reasonable conditions of release."  Pet. Br. at 29.

In *Cristian A.R.*, the Court found the potential of injury to petitioners to be high and also found that the public interest supported the release of Petitioners before they contract COVID-19 to preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems.  *See* 2020 WL 2092616, at *13 (citing *Rafael L.O.*, 2020 WL 1808843, at *9).  As the Court recognized in *Cristian A.R.*, "Respondents also have a legitimate interest in ensuring that Petitioners do not flee and in protecting the public." *Id.*; *see also Rafael L.O.* 2020 WL 1808843 (explaining that release is warranted where the "legitimate interests of ICE (in particular, flight risk and dangerousness) can be accommodated by the conditions of release."); *Thakker v. Doll*, 2020 WL 2025384, at *8 (M.D. Pa. Apr. 27, 2020) ("*Thakker II*")

(explaining that each petitioner has "an unique set of circumstances that [the court] must balance against the public interest" and identifying petitioners' "failure to appear at future immigration proceedings, or to commit crimes while released" as factors weighing in favor of detention). Indeed, in *Cristian A.R.*, the Court balanced the equities and considered the individual criminal histories of each petitioner in determining whether there were conditions of release that could ensure the public's safety and gave great weight to the fact that the petitioners were "each discretionally detained by ICE under 8 U.S.C. § 1226(a)", had "no pending charges, and all have significant ties to this country such that they can be safely released on reasonable conditions of supervision." 2020 WL 2092616, at *13. For those with serious criminal histories, the Court also imposed "the most stringent conditions of release, including electronic monitoring." [28] *Id.*

By contrast, other courts have considered violent or otherwise serious or persistent criminal conduct as factors that support denying release from detention. Judge Jones in *Thakker II*, identified violent crime as a factor that weighs heavily in favor of continued (or return to) detention. *See* 2020 WL 2025384, *9 ("Here, Petitioner has been convicted of a violent crime: the assault of his wife. . . . Conviction of a violent crime weighs heavily in favor of returning Petitioner to detention."). Similarly, in *Romeo S.K. v. Tsoukaris*, No. 20-5512, 2020 WL 2537647, at *7 (D.N.J., 2020), Judge Vasquez recognized that a petitioner, who had diabetes and hypertension, was vulnerable to COVID-19 complications, but concluded that there were no adequate conditions of relief that could satisfy the government's legitimate interests due to petitioner's criminal history

---

[28] In analyzing the criminal histories of each petitioner, the Court explained that Alvaro N.M., who had the most serious offenses, was last arrested for a felony twenty-eight years ago, and thus this crime was so temporally distant that it did not subject him to mandatory immigration detention. *See id.* Although Cristian A.R. was more recently charged with serious crimes, the Court explained that he had pleaded guilty to attempted endangering the welfare of a child, a misdemeanor under state law, for which he received a one-year conditional discharge sentence and no term of incarceration. *Id.*

involving recent convictions for separate incidents, coupled with his history of dishonesty with immigration officials and ICE officers. *Id.* These factors, "tip[ped] the balance in favor of the government." *Id.; see also Reyes P.*, 2020 WL 2474423, at *7 n.8 (discussing the balancing of the equities and the public interest and finding that petitioner's outstanding criminal charges for sexual abuse in the first degree involving sexual contact with a child was relevant to that analysis).

With these principles in mind, the Court now balances the equities and public interest as to each Petitioner and also determines in its sound discretion whether all four factors, taken together, balance in favor of granting the relief sought." *See Fulton*, 922 F.3d at 152.

With respect to Petitioners Omatola H. and Raul J., the Court finds that it has insufficient information regarding certain of their convictions and will reserve judgment until additional information is provided. On December 15, 2011, Omatola H. was arrested for sexual abuse in the first degree under N.Y. Penal Law § 130.65 and forcible touching under N.Y. Penal Law § 130.52, although she pled guilty to endangering the welfare of a child under N.Y. Penal § 260.10 and was sentenced to probation. Omatola H. Criminal Documents. While the Court recognizes that the 2011 arrest is now nearly nine years distant, Petitioners indicate that she is the mother of two minor children and, if released, would reside in New York with her children. April 22, 2020 Letter at 2, ECF No. 28. Before the Court can balance the equities, Petitioners must provide the underlying factual basis for the 2011 arrest, including whether the victim was her child. As to Raul J., the Court similarly lacks sufficient information regarding the basis for his 2016 arrest for rape in the third degree (victim less than 17 years old), for which he pled guilty to child endangerment, was sentenced to three years' probation, and under an order of protection. *See* Raul J. Rap Sheet. The Court takes note of the fact that if he were released, Petitioners state that he would continue to serve probation under monitoring by the relevant state agency. See Pet. Reply at 12. Given the

26

gravity of the 2016 arrest charge, however, the Court needs further information regarding the facts underlying the arrest before it can properly balance the equities. Therefore, Petitioners shall provide the requested information regarding Omatola H. and Raul J. within 10 days of the date of the accompanying Order.

Finally, the Court finds that the balance of equities weighs against release of Petitioners Frederic B. and Nasreddine I. As to Frederic B., he has been convicted of or pled guilty to several larceny-related offenses and one criminal possession of stolen property offense since 2016. *See* Frederic B. Rap Sheet. In 2019 alone, after he was released on bond by the immigration judge, he was arrested on four separate occasions for offenses ranging from robbery, assault, unlawful possession of a handgun, larceny, identity theft, and forgery, among others. *See id.* The Court acknowledges that he suffers from both physical and mental ailments, has cooperated with law enforcement in a criminal matter, agrees to plead guilty to two counts of robbery and one count of grand larceny to resolve the 2019 charges, and will be supervised by probation if released. *See* Am. Petition ¶¶ 10, 73; Ostolaza Decl. ¶ 9. The Court nevertheless finds that there are no adequate conditions of release that will ensure the public's safety due to the recency, seriousness, and frequency of the charges pending against him and also finds that the overall balancing of all four factors weighs against release from detention while these serious charges are pending.

As to Nasreddine I., he was arrested on August 1, 2018 for rape in the first degree, criminal obstruction of breathing or blood circulation, and forcible touching, and was later convicted of assault in the third degree, criminal obstruction of breathing, and forcible touching. Nasreddine I. Immigration Judge Bond Decision at 2. He was sentenced to six months' imprisonment and ordered a five-year order of protection on behalf of the victim, his spouse. *See id.* at 2-3. While the Court recognizes that he suffers from several physical and mental ailments and only has one

27

prior arrest, *see* Ostolaza Decl. ¶¶ 14-16, the factual basis underlying the 2018 offenses weigh against release here. Specifically, as noted by the immigration judge, the complaint alleged that he forcibly engaged in sexual intercourse with the victim without her consent, punched her as he penetrated her, and strangled her until she almost lost consciousness. *Id.* at 2. The Court acknowledges that he denied the allegations and alleged that his spouse was the aggressor, but notes that the victim was observed with bruises and redness. *Id.* at 2-3. Nevertheless, given the recency and seriousness of the offenses to which he ultimately pled guilty, the Court concludes that there are no adequate conditions of release that can ensure the public's safety. The Court also finds that the balancing of all four factors weighs against his release from detention.

Having failed to meet the test for a preliminary injunction, Petitioners Frederic B. and Nasreddine I. also fail to meet the more stringent "extraordinary circumstances" test.

## IV.    CONCLUSION

Having found that the balancing of all four preliminary injunction factors weighs in favor of denying release of two Petitioners, the Court denies the preliminary injunction without prejudice as Frederic B. and Nasreddine I. and also denies habeas release based on extraordinary circumstances. The denial of relief is without prejudice to changed circumstances at the Facilities and/or their individual circumstances. The Court will reserve judgment as to Omatola H. and Raul J. until the additional information as outlined in this Opinion is received. At this time, the Court will sever this matter into individual cases. The Court will provide Frederic B. and Nasreddine I. with 30 days in which to file individual amended petitions in the newly-severed cases prior to closing those matters. An appropriate Order follows.

Dated:  July 14, 2020                           _*s/ Madeline Cox Arleo*_____
                                             **Hon. Madeline Cox Arleo**
                                             **UNITED STATES DISTRICT JUDGE**